# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 22-0786V**
UNPUBLISHED

| | |
|---|---|
| BRIAN BUGGE,<br><br>Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>Respondent. | Chief Special Master Corcoran<br><br>Filed: June 29, 2026 |

*John Beaulieu, Siri & Glimstad, LLP, Louisville, KY, for Petitioner.*

*Madison Emily Murray, U.S. Department of Justice, Washington, DC, for Respondent.*

## FINDINGS OF FACT[1]

On July 20, 2022, Brian Bugge filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered a left shoulder injury related to vaccine administration ("SIRVA") from an influenza ("flu") vaccine he received on November 9, 2021. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

---

[1] Because this unpublished Fact Ruling contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Fact Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

After a review of the record and other filings, and for the reasons set forth below, I find that Petitioner has preponderantly established (albeit *barely*) that the vaccine at issue was more likely than not administered to his left arm, as alleged, and that his left shoulder pain likely began within 48 hours of vaccination.

## I. Relevant Procedural History

Mr. Bugge filed his petition for compensation along with medical record exhibits from July to December 2022. (ECF No. 1, 1-20). While the parties initially attempted to informally resolve this case, they were unable to do so. Petitioner filed a status report stating that "[d]ue to a disagreement over facts and litigative risk, Petitioner believes further negotiations would be unproductive. Petitioner believes this impasse could be resolved after the Court considers a Motion for Finding of Fact to determine the site of Petitioner's influenza vaccine." ECF No. 44. The parties subsequently filed briefing requesting a ruling on situs and onset. Petitioner's Motion for Factual Ruling (ECF No. 46, "Mot."), Respondent's Response (ECF No. 47, "Opp."), Petitioner's Reply (ECF No. 48, "Reply"). My ruling is set forth below.

## II. Relevant Medical History

On November 9, 2021, Mr. Bugge (a 70-year-old retired police officer working as a private security consultant) received a flu vaccine and Moderna Covid-19 booster at a Walgreens pharmacy in Staten Island, New York. Ex. 4 at 3; Ex. 13 at 3-7. The vaccination record has the "R" circled for the flu vaccine, indicating that Petitioner received the flu vaccine in his right deltoid, and a Moderna Covid-19 booster in his left deltoid (with "L" handwritten in and circled). Ex. 13 at 4, 6. Petitioner's pre-vaccination medical records reveal no injuries, inflammation, or dysfunction in either shoulder or arm. Ex. 2 at 1 – 51.

There is no medical record evidence of any reaction to either of these vaccinations, and (as noted below), Petitioner delayed formal treatment for his alleged injury for four months. (At the same time, there is record evidence – also discussed below – that Petitioner contacted his primary care provider ("PCP") about the disputed situs matter *before* ever complaining of a vaccine adverse event).

On March 16, 2022, Mr. Bugge emailed his PCP, Wilfredo Velez, M.D., via a MyChart online portal. Ex. 17 at 2. Petitioner reported that "I received an injection of Flu vaccine at Walgreens on 11/9/21. My *left arm* has been bothering me ever since. I thought it would go away but it hasn't. I just researched my symptoms online and it would appear I have SIRVA. The pain prevents full motion of my left arm. I would like to get an MRI to confirm SIRVA..." *Id.* (emphasis added). Dr. Vasquez noted that Mr. Bugge would need

to call for an appointment for a physical, as Petitioner had not been at his PCP's office in 18 months. *Id*.

The next day, Mr. Bugge emailed his friend Christopher Brogna. Ex. 3 at 2. The subject line stated: "Figured out what the problem is with my left arm." Petitioner noted that he was experiencing limited range of motion in his left arm and his left arm pain "never got better." Ex. 3 at 2. Petitioner also wrote that his symptoms were "due to the lousy Flu vaccine injection" that he received in November 2021. *Id*. Petitioner added that after researching his symptoms, "it turn[ed] out to be SIRVA" and he noted that "[i]f the needle is placed too high[,] then it enters the shoulder joint instead of the deltoid muscle." *Id*. Mr. Bugge stated that he made an upcoming doctor appointment, and he hoped to complete an MRI and get a referral for physical therapy. *Id*. Mr. Brogna responded stating, "I remember when you were down here right after you go that shot that you were in a lot of pain. I think it's natural to hope it goes away on its own. But at this point it appears it was something more serious…" *Id*.

On March 18, 2022, Mr. Bugge emailed Dr. Velez three attachments that included two PDF documents that described SIRVA. Ex. 17 at 3. Petitioner typed that his left arm "pain and restriction of motion happened after getting a flu vaccine injection at Walgreens on 11/9/21." *Id*. He also noted that "[w]hen I researched what it could be [,] I found that it was SIRVA[.]" He requested that Dr. Velez review the SIRVA-related attachments.[3] *Id*.

Two weeks later, on March 31, 2022, Mr. Bugge went to see Dr. Velez for an in-person medical appointment regarding his left arm. Ex. 2 at 54-56. Petitioner reported that he "had a Flu shot last Nov in the left deltoid, and developed pains in the area soon after, which has persisted to this day." *Id*. at 55. Petitioner reported that his left arm pain limited his movement. *Id*. He also reported that he had not taken any medications for his symptoms and "fe[lt] fine otherwise." *Id*.

On exam, Mr. Bugge displayed decreased range of motion and tenderness in his left shoulder, and he showed pain with movement. *Id*. His left shoulder x-ray, completed that same day (for "[p]ain following a flu vaccination"), showed "[m]ild arthrosis of the acromioclavicular joint" with otherwise normal findings. Ex. 2 at 60; Ex. 5 at 4. Dr. Velez diagnosed Mr. Bugge with left shoulder pain, commenting that it could be "[d]ue to SIRVA?" and noting that Petitioner "was concerned about possible SIRVA." Ex. 2 at 55, 62. Dr. Velez also prescribed ibuprofen and referred Mr. Bugge for an orthopedic consultation. *Id*.

[3] The titles of the three PDF attachments were (1) "A 'Needling' Problem' – Shoulder Injury Related to Vaccine Administration," (2) "vaccine-administration," and (3) "Talking to Doctors about SIRVA – SIRVA Resources."

On April 6, 2022, Mr. Bugge went to orthopedic specialist Adam R. Bruccoleri, PA, for a left shoulder evaluation. Ex. 6 at 4-6. Petitioner reported that he "developed severe shoulder pain the same day as the [flu shot] injection" in November 2021. *Id*. He also noted his pain had since worsened, adding that his ibuprofen prescription provided "him with some relief." *Id.* Mr. Bugge rated his pain as 7-9/10 and reported that his symptoms were in his "left arm/bicep[.]" *Id*. On exam, Petitioner had reduced left shoulder range of motion and a positive result on the Jobs shoulder impingement test. *Id*. at 5. PA Bruccoleri also reviewed Mr. Bugge's March 2022 left shoulder x-ray, and he diagnosed Petitioner with acute left shoulder pain. *Id*. at 5-6. An MRI was scheduled to evaluate for a rotator cuff tear. *Id*. at 5.

On April 8, 2022, Mr. Bugge underwent a left shoulder MRI which showed "supraspinatus tendinosis with low to moderate grade partial-thickness articular surface tear, infraspinatus tendinosis with low-grade partial-thickness articular surface tear, subscapularis tendinosis with low-grade partial thickness articular surface tear, superoposterior labral tear (SLAP 2), [signs of] adhesive capsulitis …, [and] mild osteoarthritis at [the] acromioclavicular joint." Ex. 5 at 5.

Mr. Bugge's next (and most recent) documented left shoulder treatment occurred three months later, on July 20, 2022, when he returned to Dr. Velez for a follow-up appointment for "chronic left shoulder pain." Ex. 7 at 12-15. Dr. Velez noted that Petitioner was being followed by an orthopedist for his shoulder injury. *Id*. During the physical exam, Mr. complained of left shoulder pain. *Id*. Dr. Velez diagnosed him with chronic left shoulder pain and noted that Petitioner's symptoms were possibly "[d]ue to SIRVA?" *Id*. at 14. Dr. Velez also instructed Mr. Bugge to stop using Flexeril and to use over-the-counter Ben-Gay and his ibuprofen prescription as needed. *Id*.

*Dispute as to Situs*

The evidence bearing on the disputed situs issue comes in the form of both medical records and witness statements. As already noted, the original vaccination record indicates that Petitioner did not receive the flu vaccine in his left arm. Then, there is a record from February 10, 2022 – the next actual medical record in this case, and generated before Petitioner ever complained of arm pain. At that time, Mr. Bugge emailed Dr. Velez asking about the administration site for his January and February 2021 Covid-19 vaccines. Ex. 18 at 1. Petitioner requested that Dr. Velez notify him if his office had documented the related vaccination site. *Id*. Petitioner did not mention or request any details about his receipt of the flu vaccine, however – and did not at this time report any arm pain. *Id*. A few hours later, a nurse from Dr. Velez's office responded to Petitioner's email, noting that Petitioner's "immunization records" indicated that he received these prior Covid-19 vaccines in "the left deltoid (upper left arm)." Ex. 18 at 1. If correct, this

would be consistent with the November 2021 vaccine administration record (while *inconsistent* with Petitioner's contentions that he had repeatedly received COVID boosters in his right arm).

In a sworn affidavit, however, Mr. Bugge has stated that "I am absolutely certain that I received the COVID-19 vaccine in my right arm and my flu vaccine in my left arm because I had received the primary two-dose series of the COVID-19 vaccines in my right arm, and I specifically advised the pharmacist that I wanted the COVID-19 vaccine in my right arm, where the first two COVID-19 vaccines were administered, and the flu vaccine in my left arm. The COVID-19 vaccine was administered first into my right arm. Following receipt of the COVID-19 vaccine, the pharmacist left the room to get the flu vaccine. When the pharmacist returned, the flu vaccine was administered into my left arm." Ex. 1 at 2. (If Petitioner is correct, this means that *three* vaccine records were incorrect – not just the one pertaining to the vaccine at issue).

In his supplemental affidavit, Mr. Bugge provided additional details about receiving his flu and COVID-19 vaccines in November 2021. He stated, "[t]he pandemic was in full swing, and people were desperate to receive the COVID-19 vaccines and boosters. There were probably about ten people waiting to either receive vaccines or waiting the required 15 minutes after vaccine administration." Ex. 14 at 8. He goes on to describe that "[a]t Walgreens, I was taken into a separate room to have my vaccines administered … "[a]fter giving me the COVID-19 booster in my right arm, Mr. Lotito [Pharmacy Manager] acted as if that was the only vaccine I was there to receive. I told him I had registered to receive the flu shot as well. I could see Mr. Lotito was annoyed and he briskly asked me if I had told the front desk that I wanted a flu shot. I explained that I had, and I was told that would be fine. Mr. Lotito then told me to wait in the room and then left. About ten minutes later, Mr. Lotito appeared and gave me my flu shot in my left arm." Ex. 14 at 9.

From July 21, 2022 (around the time of the claim's initiation) to April 29, 2023, Mr. Bugge made numerous attempts to have Dr. Velez's staff and the Walgreens corporate offices update his vaccination records to reflect his contention that in November 2021 he received the flu vaccine in his left deltoid. However, the records were not amended. *See e.g.* Ex. 10 at 2-3 (documenting a July 21, 2022 letter from Petitioner to the Walgreens Vice President of Pharmacy Operations, reporting that Walgreens refused to fill his Flexeril prescription and noting that he received his November 2021 flu vaccination in his left arm, not his right arm as his certified immunization records reflect); Ex. 18 at 2, 11, 13 (noting Petitioner's February 21, 2023 and March 2, 2023 request for staff in Dr. Velez's office to amend the site of vaccination in his immunization records); Ex. 20 at 2-4 (noting Petitioner's February 16, 2023 request for Walgreens to amend the site of vaccination in his immunization records as the local pharmacist declined to do so after noting that the original records were accurate); Ex. 23 at 5 (noting Petitioner's April 12,

2023 request for Walgreens to amend his vaccination records to reflect his reports that he received his November 2021 flu vaccination in his left, not right, arm); Ex. 25 (documenting a March 22, 2023 letter from Petitioner to the U.S Inspector General at HHS); Ex. 27 at 2 (documenting an April 12, 2023 response from the Office of the Inspecter General at HHS, indicating that it would seriously consider and appropriately research and handle Petitioner's reports about inaccuracies in his Walgreens vaccination records); Ex. 29 at 2 (documenting an April 25, 2023 response from the Walgreens Privacy Office to Petitioner that indicates Walgreens concluded that Petitioner's vaccination records were "accurate and complete" regarding the site of his November 2021 flu vaccination and 2021 Covid-19 vaccinations); Ex. 30 at 2 (documenting an April 29, 2023 letter from Petitioner to Walgreens in which he disagreed with the company's finding that his vaccination records were "accurate and complete" and noting that Petitioner planned to file a formal complaint with HHS).

Mr. Bugge has also filed an affidavit from his daughter, Brittany Bugge, dated April 7, 2023. Ex. 16. Ms. Bugge states that "I distinctly remember that right after my father received the flu shot in his left arm, he told my mother, Carol Bugge … and me about the intense pain he felt in his left arm… I clearly remember that my father told me the pain was from the flu shot – not the COVID-19 booster vaccine… My father told me that he had significant pain and limited range of motion in his left arm after receiving the flu vaccine on November 9, 2021." *Id*. at 1.

Mr. Bugge also filed an affidavit from his wife, Carol Bugge, dated April 7, 2023. Ex. 21. Ms. Carol Bugge stated, "I accompanied Brian [Petitioner] to Walgreens on November 9, 2021 to receive his flu shot and COVID-19 booster. I waited inside Walgreens the entire time Brian's vaccines were administered so I could drive Brian home when the vaccines were completed… When we got in the car after the vaccines were given, Brian immediately complained of pain in his left arm. When I asked Brian if the pain was from the COVID-19 booster or flu shot, Brian said the left arm pain was from the flu shot, where the flu shot was administered… I vividly remember Brian receiving the flu shot in his left arm because he described the pain from the flu shot, in his left arm, in great detail immediately after it was administered. Additionally, Brian has consistently stated from the date of the flu vaccine, November 9, 2021, to today, he received the flu shot in his left arm." *Id.* at 1.

Mr. Bugge also filed an affidavit from his friend of 50 years, Christopher Brogna, dated April 3, 2023. Ex. 22 at 2-3. Mr. Brogna's affidavit noted that Petitioner told him "that he had just had a flu shot a week ago at Walgreens, and that his left arm hurt from the vaccine." *Id*. at 2, ¶ 6. Mr. Brogna added that he noticed that Mr. Bugge had trouble using utensils when they went to dinner together during Petitioner's November 2021 post-vaccination visit, and he indicated that Petitioner sent him a March 2022 email, reporting

that his "left arm continued to hurt" and reiterating that his left arm pain "was caused by his flu shot." *Id*. at 2-3, ¶¶ 6, 9.

## III. Issues

The following issues are contested: (1) whether Petitioner received the flu vaccine alleged as causal in his right or left shoulder, and (2) whether Petitioner experienced the onset of left shoulder pain within 48 hours of vaccination. (42 C.F.R. § 100.3(a)(XIV)(B)) and § 100.3(c)(10)(ii) (QAI criteria)).

## IV. Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove by a preponderance of the evidence the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). The Federal Circuit has said that

> Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events.

*Cucuras v. Sec'y of Health & Human Servs*., 993 F.2d 1525, 1528 (Fed. Cir. 1993). Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs*., No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005).

The Federal Circuit recently stressed, however, that records enjoy no automatic presumption of accuracy, despite their "trustworthy" evidentiary character. *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1384 (Fed. Cir. 2021). Indeed, "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Human Servs*., 42 Fed. Cl. 381, 391 (1998); *see also Lowrie*, 2005 WL 6117475 at *19 ("written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent").

The Court has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time

period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs*., 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

Thus, medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Human Servs*., No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Human Servs*., 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs*., 991 F.2d 1570, 1575 (Fed. Cir. 1993).

The special master is obligated to fully consider and compare not only the medical records, testimony, but also all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Human Servs*., 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational). And although later oral testimony that conflicts with medical records is less reliable as a general matter, it is appropriate for a special master to credit a petitioner's lay testimony where is does not conflict with the contemporaneous records. *Kirby*, 997 F.3d at 1382-84.

## Analysis

### *A. Situs*

Respondent argues that Petitioner's symptoms were not limited to the shoulder in which the November 2021 flu vaccine was administered, because Petitioner's vaccination records "clearly reflect that he received the flu vaccination in his right deltoid." Opp. at 17. Respondent notes in support that despite Mr. Bugge's numerous attempts to have Walgreens and Dr. Velez's staff change his vaccination record, they refused to do so. *Id*.

This objection is more than well-founded, but a *slim* preponderance of the evidence ultimately supports Petitioner's situs contention.[4]

[4] This case epitomizes the characterization of the preponderant standard as only requiring proof that, from a probative standpoint, weighs "50 percent and a feather."

Unquestionably, the vaccination administration record (Ex. 13 at 4, 6) states that Petitioner received the flu vaccine in his right deltoid. That record also contains handwritten notations supporting Respondent's situs position – something that in prior cases I have deemed significant evidence establishing the record's trustworthiness. *See,* e.g., *Draper v. Sec'y of Health & Hum. Servs.*, No. 22-1517V, 2025 WL 2675968, at *3 (Fed. Cl. Aug. 15, 2025); *Rizvi v. Sec'y of Health & Hum. Servs.*, No. 21-881V, 2022 WL 2284311, at *5 (Fed. Cl. Spec. Mstr. May 13, 2022); *Rodgers v. Sec'y of Health & Hum. Servs.*, No. 18-0559V, 2020 WL 1870268, at *5 (Fed. Cl. Spec. Mstr. Mar. 11, 2020).

As I have often noted, however, it is not unusual for the information regarding situs of vaccination set forth in administration records to be incorrect.[5] In many instances, the information regarding situs is prerecorded but never subsequently corrected, even if the vaccine was actually administered in the opposing arm.[6] Thus, the mere fact the administration record comes "first" does not mean it is automatically entitled to great evidentiary weight (although here that premise is complicated by the handwritten evidence).[7]

There is also the fact that Petitioner received a COVID-19 vaccine (which is not currently covered by the Vaccine Program) in November 2021 – and if that vaccine was administered in the effected shoulder, Petitioner would have no cause of action even if the vaccine had otherwise caused his left-side SIRVA. The administration of that non-covered vaccine to the left shoulder is not only bulwarked by a handwritten note in the initial record, but is consistent with the apparent situs of Petitioner's receipt of the COVID—19 vaccine two times in the year before (despite Petitioner's vociferous denials

[5] *See,* e.g., *Arnold v. Sec'y of Health & Hum. Servs.,* No. 20-1038V 2021 WL 2908519, at *4 (Fed. CL. Spec. Mstr. June 9, 2021); *Syed v. Sec'y of Health & Hum. Servs.,* No. 19-1364V, 2021 WL 2229829, at *4-5 (Fed. Cl. Spec. Mstr. Apr. 28, 2021); *Ruddy v. Sec'y of Health & Hum. Servs.*, No 19-1998V, 2021 WL 1291777, at *5 (Fed. Cl. Spec. Mstr. Mar. 5, 2021); *Desai v. Sec'y of Health & Hum. Servs.*, No 14-0811V, 2020 WL 4919777, at *14 (Fed. Cl. Spec. Mstr. July 30, 2020); *Rodgers v. Sec'y of Health & Hum. Servs.*, No. 18-0559V, 2020 WL 1870268, at *5 (Fed. Cl. Spec. Mstr. Mar. 11, 2020); *Stoliker v. Sec'y of Health & Hum. Servs.*, No. 17-0990V, 2018 WL 6718629, at *4 (Fed. Cl. Spec. Mstr. Nov. 9, 2018).

[6] A recent ruling by another special master noted that the pharmacist who had administered the relevant vaccine actually testified that she intentionally inputs "left deltoid" into the pharmacy computer system as a matter of course, without confirming the actual site of vaccination, based upon the assumption that most vaccinees are right-handed (and therefore wish to avoid transient discomfort to the arm they most often use). *Mezzacapo v. Sec'y of Health & Hum. Servs.*, No. 18-1977V, 2021 WL 1940435, at *4 (Fed. Cl. Spec. Mstr. Apr. 19, 2021). !

[7] In fact, I have previously determined that the very nature of vaccination record creation provides some basis for *not* accepting them as the evidence worthy of highest probative weight. *See,* e.g., *Rizvi*, 2022 WL 2284311, at *4.

to the contrary).[8]

At the same time, however, virtually all evidence in the record temporally thereafter is consistent with Petitioner's argument about situs. In seeking treatment, Petitioner consistently related his left shoulder pain to his November 2021 flu vaccination. He never once stated that he received the flu vaccine to his right arm. He also has provided very detailed facts about his visit to the Walgreens pharmacy on November 9, 2021, and is insistent that he received the flu vaccine to his left shoulder, as he specifically wanted all his COVID-19 vaccines administered to his right shoulder. Mr. Bugge also described how crowded, hectic, and chaotic the pharmacy was when he received his vaccines. He made substantial efforts through the corporate process to correct his vaccination record when he saw that the situs was incorrect, although he was ultimately unable to do so. *See* e.g., Ex. 10; Ex. 20; Ex. 23; Ex. 30. And there is no dispute that the Petitioner sought left-sided treatment (although that fact does not bulwark Petitioner's situs arguments).

In addition, Petitioner maintains he unquestionably received the COVID-19 vaccine both times the year before in his unaffected right arm, contending that a chaotic setting at the PCP office likely resulted in an erroneous record. Ex. 14 at 5, 7-8. He has endeavored somewhat to explain his ardent efforts to correct the earlier records from 2021 (although it remains unexplained why this need took precedence over reporting his shoulder injury). *Id.* at 11. And Mr. Bugge also filed sworn affidavits from his family and friend Chris Brogna, who all stated that they were certain Mr. Bugge received the flu shot in his left arm. Ex. 16 at 1-2; Ex. 21 at 1-3; Ex. 22 at 1-3. Mr. Bugge emailed his friend Chris Brogna a few months after the flu vaccine was administered (March 17, 2022) complaining that his flu vaccine had injured his left arm. Ex. 3 at 1. This vouching is somewhat less persuasive than direct evidence from the Petitioner, but it has some evidentiary value.

Several other factors in this record call into question Petitioner's situs arguments. It is somewhat suspect that Petitioner's first post-vaccination communication with his treater was not to complain of shoulder pain (indeed, he delayed doing so for several months), but instead to obtain clarification as to whether he had the prior year received COVID boosters in his left or right arm – as if he were already contemplating litigation (but was aware that the COVID vaccine is not covered). That impression is heightened by Petitioner's attempt to educate his treater about SIRVA. And while the witness statements

---

[8] Petitioner argues that Ex.18 at pages 8-9 demonstrates that the initial entries of Mr. Bugge's COVID-19 vaccines from January and February 2021 "clearly indicate both prior COVID-19 vaccines were to be administered in his right arm." Ex. 18 at 8-9. While the "incomplete" entries in those records do indicate that the COVID vaccines were to be administered in the right deltoid, the actual and "completed" entries indicate the vaccines were administered in the left deltoid. Thus, this record is not entirely helpful in deciding situs.

offered herein are detailed, they do not automatically merit more weight than the plain evidentiary record.

In the end, this is a difficult factual scenario to decide, and it presents a very close call. But after reviewing all the evidence in the case, including the medical records, witness affidavits, and considering the substantial effort Mr. Bugge made to attempt to have his vaccination records correct, I find that the record as it stands preponderates *barely* in favor of the determination that Petitioner received the flu vaccine in his left shoulder, as alleged. Not all SIRVA cases should be resolved in a Petitioner's favor simply because they wish to gainsay a vaccination record, of course – but I can in the exercise of weighing the proof here find Petitioner's recollection has just enough evidentiary support to carry the day.

*B. Onset*

To meet the definition of a Table SIRVA, a petitioner must show that she experienced the onset of pain within 48 hours of vaccination (42 C.F.R. § 100.3(a)(XIV)(B)) and § 100.3(c)(10)(ii) (QAI criteria)). Respondent argues that because Mr. Bugge waited over four months before he saw a medical provider for his left shoulder pain, he failed to provide objective evidence that his left shoulder symptoms occurred within 48 hours of his 2021 flu vaccination. Opp. at 12. In addition, Respondent argues that Mr. Bugge used vague terms to describe the onset of his pain, noting that he received his flu vaccination in his contralateral "left deltoid, and developed pains in the area *soon after*, which . . . persisted[.]" Opp. at 13 (citing Ex. 2 at 55). Respondent goes on to state that "[e]in petitioner's prior March 17, 2022 MyChart email to Dr. Velez, when he initially reported his left shoulder symptoms, petitioner wrote that his left arm had "bother[ed him] *ever since*" he received his flu vaccination." *Id*.

The evidence preponderates in Petitioner's favor on this issue. In his affidavit, Mr. Bugge stated that he "kept hoping the injury would heal but as time went on it became abundantly clear that the pain was not going away on its own. The pain continued for months, and my quality of life decreased. As such, I made an appointment with my primary care physician to examine the injury and provide me with treatment advice as I could no longer live with the daily pain" Ex. 1 at 2. In his supplemental affidavit, Mr. Bugge states that "[a]lthough I immediately felt great pain and limited range of motion in my left arm after receiving the flu vaccine, I was not able to schedule an appointment right away with my primary care provider, Dr. Velez. One of the main reasons for the delay is because when I received the flu and COVID-19 vaccines on November 9, 2021, it was in the height of the pandemic, and also during the hectic holiday season. Additionally, during this time, Dr. Anthony Fauci was advising people not to even visit family and friends for the holidays because of the high transmission rate of the COVID-19 virus." Ex. 14 at 1-2.

Mr. Bugge goes on to explain that another reason he delayed treatment "is that my wife, Carol Bugge … had her own significant health problems at this time. I did not want to chance catching any type of virus, including COVID-19, thereby putting her health at risk." *Id*. at 2. Mr. Bugge also explained that "I naturally have an aversion to medical care. As noted in the record from Dr. Velez, I had not seen Dr. Velez for 18 months prior to scheduling the appointment for my SIRVA." *Id*. at 2.

When Mr. Bugge first reported left shoulder pain in a MyChart email to his PCP, he specifically reported left arm pain "since" he received his November 2021 vaccination. Ex. 17 at 2. Mr. Bugge also emailed Dr. Velez again on March 18, 2022, stating that his pain and reduced range of motion happened "after getting a flu vaccine injection at Walgreens on 11/9/21." Ex. 17 at 3. When he saw Dr. Velez in person on March 31, 2022, he reported that he "had a Flu shot last Nov in the left deltoid, and developed pains in the area soon after, which ha[d] presented[.]" *Id*. at 55. I have explained in other SIRVA decisions where onset has been contested, Respondent's characterization of the term "since" as impermissibly vague for purposes of onset determinations is not compelling. *See*, e.g., *Merwitz v. Sec'y of Health & Hum. Servs*., No. 20-1141V, 2022 WL 17820768, at *3 (Fed. Cl. Spec. Mstr. Oct. 11, 2022). Instead, I have found that definitions for that term include the following, which support an immediate pain onset: 1) "from a definite past time until now" and 2) "from a particular time in the past until a later time." This is, therefore, not strong grounds for an adverse onset finding.

In addition, although there is no requirement that a medical record specify the date of onset of symptoms, in this case there is a medical record with a more specific date range – and as the most contemporaneous medical record, it merits weight. When seeing his orthopedic specialist on April 6, 2022, Dr. Bruccoleri noted that Mr. Bugge "developed severe shoulder pain *the same day as the [flu shot] injection*" in November 2021. Ex. 6 at 4-6 (emphasis added). In this record, we have a clear statement that the onset of shoulder pain began the same day as Mr. Bugge received the flu shot. This is compelling evidence, which is well-supported by additional medical records and testimonial evidence. And the Vaccine Act allows special masters to make a variety of fact findings via the standard of preponderant evidence. *Roberson v. Sec'y of Health & Human Servs*., No. 21-2309V, 2025 WL 605724, at *7 (Fed. Cl. Spec. Mstr Jan. 24, 2025) (a specific onset date is not required; rather, a petitioner may demonstrate onset by preponderant evidence). Because onset may not be recorded, or may be recorded incorrectly, it can be determined by an overall weighing of the totality of evidence. Section13(b)(2).

I find these facts and statements by Petitioner to be credible and consistent with all his other reports that his shoulder pain began within 48 hours of receiving the vaccination. Thus, I find that Mr. Bugge has preponderantly met the 48-hour onset requirement.

## CONCLUSION

Despite Petitioner's likely entitlement success, he should not plan on a particularly large damages award. He received minimal treatment and delayed initially reporting the injury. Pain and suffering in such a case is unlikely to exceed **$20,000.00 at best**, and the parties will not be permitted to get hung up on unnecessary and wasteful settlement discussions.

**Accordingly, the following is ORDERED:**

**(1) By Friday, August 14, 2026, Petitioner shall file all updated medical records.**

**(2) Respondent shall file, by no later than Monday, August 31, 2026, a Rule 4(c) Report reflecting Respondent's position in light of the above fact-finding.**

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master